JS 44   (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Ashlawn Energy LLC

**(b)** County of Residence of First Listed Plaintiff    Fairfax, VA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Seth Linnick & John Lewis - Tucker Ellis LLP - 950 Main Avenue Suite 1100, Cleveland, OH 44113 - (216) 696-4976

## DEFENDANTS

City of Painesville

County of Residence of First Listed Defendant    Lake, OH
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

Joseph Gurley

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | | | | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1332

Brief description of cause:
Breach of contract relating to development of smart energy project

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

DEMAND $
10,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
06/04/2018

SIGNATURE OF ATTORNEY OF RECORD
s/ Seth J. Linnick

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO

**I.**     Civil Categories: (Please check <u>one category only</u>).

1. ☑  General Civil
2. ☐  Administrative Review/Social Security
3. ☐  Habeas Corpus Death Penalty

\*If under Title 28, §2255, name the SENTENCING JUDGE: _____

CASE NUMBER: _____

**II.**     <u>RELATED OR REFILED CASES</u>.  See LR 3.1 which provides in pertinent part: "If an action is filed or removed to this Court and assigned to a District Judge after which it is discontinued, dismissed or remanded to a State court, and subsequently refiled, it shall be assigned to the same Judge who received the initial case assignment without regard for the place of holding court in which the case was refiled.  Counsel or a party without counsel shall be responsible for bringing such cases to the attention of the Court by responding to the questions included on the Civil Cover Sheet."

This action:  ☐ is **RELATED** to another **PENDING** civil case   ☐ is a **REFILED** case   ☐ was **PREVIOUSLY REMANDED**

**If applicable, please indicate on page 1 in section VIII, the name of the Judge and case number.**

**III.**     In accordance with Local Civil Rule **3.8**, actions involving counties in the Eastern Division shall be filed at any of the divisional offices therein.  Actions involving counties in the Western Division shall be filed at the Toledo office. For the purpose of determining the proper division, and for statistical reasons, the following information is requested.

ANSWER ONE PARAGRAPH ONLY. ANSWER PARAGRAPHS 1 THRU 3 IN ORDER.  UPON FINDING WHICH PARAGRAPH APPLIES TO YOUR CASE, ANSWER IT AND STOP.

(1)     <u>Resident defendant.</u> If the defendant resides in a county within this district, please set forth the name of such county

<u>COUNTY:</u>  Lake County

<u>Corporation</u> **For the purpose of answering the above, a corporation is deemed to be a resident of that county in which it has its principal place of business in that district.**

(2)     <u>Non-Resident defendant.</u> If no defendant is a resident of a county in this district, please set forth the county wherein the cause of action arose or the event complained of occurred.

<u>COUNTY:</u>

(3)     <u>Other Cases</u>. If no defendant is a resident of this district, or if the defendant is a corporation not having a principle place of business within the district, and the cause of action arose or the event complained of occurred outside this district, please set forth the county of the plaintiff's residence.

<u>COUNTY:</u>

**IV.**     The Counties in the Northern District of Ohio are divided into divisions as shown below.  After the county is determined in Section **III**, please check the appropriate division.

<u>EASTERN DIVISION</u>

☐ **AKRON**            (Counties: Carroll, Holmes, Portage, Stark, Summit, Tuscarawas and Wayne)
☑ **CLEVELAND**        (Counties: Ashland, Ashtabula, Crawford, Cuyahoga, Geauga, Lake,
                           Lorain, Medina and Richland)
☐ **YOUNGSTOWN**    (Counties: Columbiana, Mahoning and Trumbull)

<u>WESTERN DIVISION</u>

☐ **TOLEDO**           (Counties: Allen, Auglaize, Defiance, Erie, Fulton, Hancock, Hardin, Henry,
                           Huron, Lucas, Marion, Mercer, Ottawa, Paulding, Putnam, Sandusky, Seneca
                           VanWert, Williams, Wood and Wyandot)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ASHLAWN ENERGY LLC, | ) | |
| 6564 Loisdale Court, Suite 600 | ) | |
| Springfield, VA 22150 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| v. | ) | |
| | ) | **(JURY DEMAND ENDORSED** |
| CITY OF PAINESVILLE, | ) | **HEREON)** |
| c/o Joseph Gurley, Esq. | ) | |
| 7 Richmond Street | ) | |
| P.O. Box 601 | ) | |
| Painesville, OH 44077 | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Ashlawn Energy, LLC brings this Complaint against defendant the City of Painesville and alleges as follows:

**INTRODUCTION**

1.      This case arises from the City of Painesville's ("Painesville" or the "City") decision to renege on promises made to its business partner, Ashlawn Energy, when those promises ceased to be politically expedient for Painesville's City leaders. As a result, millions of dollars in federal stimulus funds were squandered, hundreds of thousands of Painesville taxpayer dollars were wasted, City residents were robbed of a crown jewel progressive energy project, and Ashlawn Energy's business was effectively crippled.

2.      In 2010, the City Government of Painesville, led by then-City Manager Rita McMahon, partnered with Ashlawn Energy to win federal grant money to demonstrate Ashlawn's revolutionary energy storage technology, the Vanadium Redox Flow Battery, in the City of Painesville.

3.      The project was a major coup for both Painesville and Ashlawn. For Painesville, the battery project offered an environmentally friendly and economically sound way to alleviate the growing pressure on the City's aging coal power plant, and an opportunity to establish the city as a manufacturing hub for energy storage batteries. It also garnered unprecedented national attention, with both the Governor of Ohio and the President of the United States pointing to Painesville as a city on the cutting edge of progressive energy solutions. For Ashlawn, the Painesville project offered a unique opportunity to partner with federal, state and local government entities to demonstrate the game-changing capabilities of its VanCharg™ batteries. With full confidence in its technology, Ashlawn knew that success in Painesville would be a gateway to widespread commercialization of VanCharg™.

4.      The Painesville project got off to a promising start, with both Ashlawn and the City working diligently to meet their respective obligations. But in 2012, the project encountered an unexpected hurdle, when Ohio eliminated state funding that the parties had anticipated receiving. Undeterred and fully invested in their partnership, Ashlawn and Rita McMahon's City Government again worked together to find a pathway forward for the project, one that would utilize new energy market opportunities to attract private investment and create additional revenue for both Ashlawn and Painesville.

5.      Shortly before this new plan was set to be finalized, Rita McMahon retired. Though the battery project still had its supporters in Painesville's City Government, McMahon's

successors demonstrated apathy, and at times, outright animosity towards Ashlawn. Despite the fact that the City had already made a substantial investment in the battery project, and that the private investment concept endorsed by Rita McMahon would not have cost the City any additional money, Painesville's new City Managers had little genuine interest in moving forward with a project for which the credit would be given to their predecessor.

6.     As a result, throughout the next five years, despite persistent efforts by Ashlawn to prepare and test the technology and line up private funding, prodding from the Department of Energy, and numerous questions raised by the concerned taxpayers of Painesville, the City's leadership kept Ashlawn and the battery project in a constant state of limbo. While they had no problem paying lip service to Ashlawn, the federal government, and their constituents about wanting to go forward with the project, when the time came for action, Painesville's leaders continuously stonewalled and stalled.

7.     At present, with more than $4 million invested in the Painesville project and nothing to show for it, Ashlawn simply wants to move forward with the City to secure private funding and build the battery system. But Painesville's leaders have now made it clear that they have no intention of allowing the battery project to succeed. To the contrary, they have continued to make excuses for their inaction and have affirmatively interfered with Ashlawn's other business opportunities. Ashlawn has been left with no choice but to proceed with litigation to recover its damages.

**PARTIES**

8.     Ashlawn Energy, LLC ("Ashlawn") is a Virginia limited liability company with its principal place of business located at 6564 Loisdale Court, Suite 600, Springfield, Virginia.

9.     The City of Painesville is a municipality located in Lake County, Ohio.  Its mailing address is 7 Richmond Street, P.O. Box 601, Painesville, Ohio 44077.

<u>**JURISDICTION AND VENUE**</u>

10.     This is a controversy between citizens of different states, and the amount in controversy exceeds $75,000.00.

11.     This Court has jurisdiction pursuant to 28 U.S.C. §1332.

12.     Venue is proper pursuant to 28 U.S.C. §1391(b)(1) and (2).

<u>**FACTUAL BACKGROUND**</u>

**A.     Ashlawn Develops The VanCharg™ Vanadium Redox Flow Battery**

13.     Ashlawn Energy is a Springfield Virginia-based provider of energy storage solutions for electricity markets, strategic alliance partners, and communities seeking more reliable power infrastructures.  It was founded by Norma Byron in 2008.

14.     Ashlawn licensed the Vanadium Redox technology, and developed an energy storage solution called the VanCharg™ Vanadium Redox Fuel Cell Storage Battery ("VanCharg™").  VanCharg™ is a rechargeable fuel cell flow battery that utilizes the properties of vanadium, making it unique in its efficient operation from a single active element. VanCharg™ allows for energy to be stored in sizes up to multi-megawatt ranges for hours at a time.

15.     VanCharg™ presents numerous advantages when paired with traditional energy production.  The system improves power plant efficiency and ability to balance load, reduces operational and maintenance costs through remote operation, and reduces carbon emissions.

16.     VanCharg™ also allows industrial users to purchase and store electricity at nonpeak rates to be used in lieu of purchasing electricity at peak rates.  This tactic, known as

"Peak Shaving" allows for energy usage to be controlled during intervals of high demand in order to limit or reduce the financial consequences of increased demand.

**B.     Painesville Struggles With Growing Energy Demand And A Shortage Of Environmentally Sound Supply**

17.     The City of Painesville is a municipality located in Lake County, Ohio.  It owns and operates Painesville Municipal Power, a 32 megawatt 109-year-old coal-fired power plant (the "Coal Plant") that provides electrical power to Painesville and surrounding areas.

18.     By 2009, it was becoming clear to Painesville's leadership that the Painesville Coal Plant could not meet the rapidly growing electricity demands of the City.  Accordingly, Painesville was actively seeking ways to improve the efficiency of the Coal Plant and acquire electricity from other sources.

19.     One of the ways that the City was bridging the gap between supply from the Coal Plant and demand was to purchase power from other sources.  According to then-City Manager Rita McMahon, in the summer months when demand was at its highest, the City was paying between $70 and $100 per megawatt hour for electricity.

**C.     The Federal Government Designates Stimulus Money For Power Grid Modernization**

20.     On February 17, 2009, President Barack Obama signed the American Recovery and Reinvestment Act of 2009 into law.  Included in this $831 billion stimulus package was $4.5 billion allocated to the U.S. Department of Energy ("DOE") Office of Electricity Delivery and Energy Reliability to support power grid modernization activities.

21.     One of the programs to receive stimulus funding from the DOE was the Smart Grid Demonstration Program ("SGDP").  The SGDP was designed to provide financial support in the form of grants, up to one-half of the total project cost, to demonstrate how existing and

emerging smart grid technologies could be applied and integrated into existing power systems to support power grid modernization throughout the United States.

22.     The SGDP included approximately $600 million in government funding to support 32 projects in two separate areas:  Smart Grid Regional Demonstrations and Energy Storage Demonstrations.  The Regional Demonstrations aimed to verify smart grid viability, quantify smart grid costs and benefits, and validate new smart grid business models at scale that could be readily replicated across the country.

**D.      Ashlawn And Painesville Partner To Win Federal Stimulus Money To Demonstrate VanCharg™ In Painesville**

23.     In 2009, Norma Byron met with then-Painesville City Manager Rita McMahon to discuss Painesville's energy situation.  McMahon and other City leaders had already developed a relationship with Byron, as she had been operating a fuel cell manufacturing operation in Painesville since 2004.

24.     Together, Byron and McMahon formulated a plan to utilize Ashlawn's advanced energy storage technology to help alleviate the energy production problems impacting Painesville.   They developed a Smart Grid Regional Demonstration grant proposal  (the "DOE Proposal") that called for Painesville Municipal Power to work in partnership with the Ohio Municipal Power Plant Authority and Ashlawn to manufacture and demonstrate a 1 megawatt ("MW") 8 megawatt hour ("MWh") VanCharg™ vanadium redox flow battery ("VRFB") at the Painesville Coal Plant (the "VRFB Project" or the "Project") .

25.     Under the terms of the DOE Proposal, Painesville, as the grant recipient, would manage the Coal Plant and its employees, as well as fund and oversee the design and construction of a new building at the site of the Coal Plant to house the VRFB Project.  Ashlawn, as the grant's major sub-recipient, would be subcontracted to build all prototypes, arrange for

necessary testing, manage and contract with all other necessary subcontractors, prepare all required reports to the DOE and eventually build and install the final battery at the Coal Plant.

26. Funding for the project was expected to come from multiple sources. Half of the funds would come from the DOE Smart Grid grant. Ashlawn would be responsible for the majority of the remaining 50%, but Painesville also assumed a significant financial obligation, including being responsible for the design and construction of the facility to house the VRFB demonstration. The parties anticipated that the remaining funding would be provided by the state of Ohio under the Ohio Air Quality Development Authority ("OAQDA") Advanced Energy forgivable loan program.

27. The DOE Proposal offered significant benefits to Painesville. The Painesville VRFB Project would allow the City to reduce its carbon emissions while also achieving much-needed improvements in power distribution and efficiency through Peak Shaving. Ultimately, this would lead to energy savings for Painesville electricity consumers, and potentially even participation in revenue streams from the provision of energy services to third parties. In addition, the plan offered the potential to bring jobs to the City and establish it as a hub of flow battery design and manufacturing.

28. The DOE Proposal also held the potential to greatly benefit Ashlawn, as the Painesville VRFB Project would serve as a showpiece for the company to attract additional partners to move towards scale up and commercialization of VanCharg™.

29. On August 25, 2009, Painesville submitted the DOE Proposal to the DOE.

**E.     The Painesville/Ashlawn VRFB Project Wins Federal Funding From The DOE**

30. On November 24, 2009, the US Department of Energy National Energy Technology Laboratory announced that the DOE Proposal was one of sixteen Smart Grid

Demonstration Projects nationwide that had been approved by the DOE to receive federal funding. Painesville was awarded a Cooperative Agreement, DE-E0000233 (the "Cooperative Agreement"), to demonstrate the Ashlawn VanCharg™ VRFB at the Coal Plant. The Cooperative Agreement initially included $3,743,570 in government funding and called for the grant recipient, Painesville, to contribute an additional $5,023,688. The Cooperative Agreement was later amended to include $4,243,570 in government funding, and called for the grant recipient, Painesville, to contribute an additional $5,219,053.

31.    Shortly after the DOE's announcement, then-Ohio Governor Ted Strickland proclaimed that that the VRFB project would "help ensure that communities relying on the Painesville [Coal] [P]lant have access to a stable and efficient power supply."

32.    On May 4, 2010, Painesville and Ashlawn entered into a contract for the execution of the Painesville VRFB Project pursuant to the Cooperative Agreement, which was further amended on June 23, 2010, August 17, 2010, and February 24, 2011, to incorporated additional scope and responsibilities added by the DOE (the original and all subsequent amendments, the "2010 Contract"). The 2010 Contract called for Ashlawn to furnish to the City project management, labor, materials and equipment, and for the project to span from 2010 to 2014.

**F.    The Painesville VRFB Project Commences To National Fanfare**

33.    For the remainder of 2010 and through 2011, both the City and Ashlawn were hard at work on the VRFB Project. Painesville spent $432,828 of taxpayer funds to build a 4,900 square foot building on the site of the Painesville Coal Plant to house the VRFB Project (the "Battery Building"). Meanwhile, Ashlawn developed its supplier base, applied for the necessary

patents, built and tested prototype VRFB battery stacks, and completed an economic business model.

34.     On February 22, 2011, President Barack Obama gave special recognition to the VRFB project during a small business forum held at Cleveland State University.  He praised Norma Byron and stated that "Ashlawn is poised to manufacture a next-generation energy storage system in Painesville that will improve efficiency."  President Obama told the crowd that the Painesville project would "help families and businesses cut down on energy waste, save money and reduce dangerous carbon pollution."

35.     On February 24, 2011, Ashlawn was presented with a prestigious Advanced Energy Innovation Award for its progress on the VRFB Project by NorTech, a regional nonprofit technology-based economic development organization.

36.     By October 15, 2011, the Parties had come to a final determination as to how to allocate responsibility for the portion of the VRFB project that was not funded by the federal Smart Grid grant money.  In an October 15, 2011 revision to the Project Management Plan, which was a document required by the DOE Cooperative Agreement, Ashlawn agreed to expend $3,697,000 in matching funding, i.e., Cost Share, the City agreed to be responsible for $1,473,000 in Cost Share, and the parties agreed that a grant from the state of Ohio through OAQDA would cover the remaining $1,600,000.  The Project Management Plan was adopted by the parties in Amendment 3 to their 2010 Contract.  The Original subcontract, Amendment 3, and the October 15, 2011 revision to the Project Management Plan are attached hereto as Exhibit A.

37.     On November 15, 2011, a ribbon-cutting ceremony was held to represent the opening of a 12,000 square foot VanCharg™ final assembly commercial facility rented by

Ashlawn to manufacture vanadium redox flow batteries. In attendance for the ceremony were Rita McMahon, members of the Painesville City Council, representatives of Painesville Municipal Public Power, and a representative of Governor John Kasich's office.

38.     Throughout 2011, the City was extremely pleased with Ashlawn's efforts to get the VRFB Project completed. In a November 21, 2011, letter from City Manager Rita McMahon to OAQDA, McMahon remarked that "The City ha[d] been impressed with Ashlawn Energy's efforts since awarding of the grant" and that Painesville "look[ed] forward to a long association as Ashlawn creates high tech jobs in Painesville."

**G.      The Painesville VRFB Project Loses Its Funding From OAQDA, But The Parties Find An Alternative Solution**

39.     In April 2012, the VRFB Project encountered a significant and unexpected hurdle. Due to changing priorities at the state government level, the $1.6 million of funding that Ashlawn and the City had been expecting from OAQDA was eliminated, leaving the project with a significant shortfall.

40.     Undeterred, Rita McMahon and other members of the Painesville City Government worked with Ashlawn to develop a new strategy to make up for the deficit. From the outset of the Project, Ashlawn and the City had understood that they would need to enter into multiple agreements, including battery placement, interconnection, power-purchase, and a facility lease (the agreements collectively, the "Revenue Sharing Agreement") in order to facilitate Peak Shaving. But in addition to sharing revenue from Peak Shaving, Ashlawn and Painesville determined that they could make up for the OAQDA shortfall by incorporating additional revenue streams into the Revenue Sharing Agreement from demand response and frequency regulation. Ashlawn could then offer a percentage of these new revenue streams to potential investors to spur the investment necessary to complete the VRFB Project.

41.     With this strategy developed, in late 2012, Ashlawn applied to the Development Fund of the Western Reserve ("Western Reserve") to receive Federal New Markets Tax Credits for the VRFB project. These credits, which were designed to spur private investment in Ohio projects, offered a significant tax credit over seven years for qualified investments.

42.     Western Reserve expressed interest in providing tax credits for private investment in the VRFB project. However, prior to awarding any tax credits, Western Reserve informed Ashlawn that it needed to produce a Revenue Sharing Agreement, approved by the Painesville City Council, affirming Painesville's commitment to allowing Ashlawn to operate its VanCharg™ battery on Painesville's premises in the Battery Building, and contract terms specifying sharing of revenues from third-party energy sales from the battery.

**H.     Rita McMahon Retires And Painesville's Interim Leadership Begins Stalling The Progress Of The VRFB Project**

43.     On November 1, 2012, Rita McMahon retired as City Manager of Painesville. She was replaced, on an interim basis, by Assistant City Manager/Community Development Director Doug Lewis.

44.     While this change was occurring, other members of Painesville's City Government, including Economic Development Director Cathy Bieterman, were working hard to draft the Revenue Sharing Agreement necessary for Ashlawn to secure the Western Reserve New Market Tax Credits (the "Western Reserve Proposal").

45.     The Western Reserve Proposal was first presented to the Painesville City Council on April 15, 2013 through a "Resolution Authorizing the City Manager to Enter into a Contract with Ashlawn Energy, LLC for Energy and Services Associated with the Vanadium Redox Battery Demonstration Project." It included a power purchase agreement, a building lease

agreement, and an operations and maintenance agreement with Ashlawn to service the VRFB Project.

46.     According to Doug Lewis's May 17, 2013 City Manager's Report, the Western Reserve Proposal was "structured to be cost neutral" for the city. In addition, it guaranteed that any cost overruns in the completion of the VRFB project would be reimbursed by Ashlawn, although nothing in the proposal relieved the City of its existing spending obligations undertaken pursuant to the original DOE Cooperative Agreement.

47.     The Western Reserve Proposal was presented to the City Council on April 15, again on May 6, and a third time on May 20, 2013. Each time, the Resolution was tabled without explanation. No vote was ever taken, and eventually, the Tax Credits were given to other projects.

48.     Nevertheless, the Painesville City Government continued to signal that it would go forward with a Revenue Sharing Agreement, so Ashlawn kept working and expending resources. In June 2013, Norma Byron continued to meet with potential investors and exchange drafts of the necessary contracts with Cathy Bieterman.

49.     On June 17, 2013, Byron made another presentation to the Painesville City Council. She informed the Council that she had recently met with a group of investors who were interested in funding the remaining portion of the VRFB project. She reminded the Council that proceeding with the Energy Sales Agreement did not place any risk on the City, and that the onus would be on Ashlawn to secure willing investors. She concluded by saying, "Let's move ahead . . . . Put the risk on Ashlawn Energy . . . . Let's move together in the partnership that we've come to know and come to enjoy working here with the City of Painesville."

50.    After Byron completed her presentation, Painesville residents were given a chance to offer their comments.  The first resident to speak acknowledged the revenue and job creation potential of the Ashlawn partnership and bluntly asked the City Council, "What's the hold up?"

51.    A second resident stood up and stated, "The folks from Ashlawn Energy have been here a number of times.  I guess the first question I would have is what is the hold up? . . . What exactly is the problem that is holding this up?"

52.    Then-City Council President Joseph Hada responded, stating:  "I would say that Council wants to make sure that, uh, you know we have everything in order, and until we feel comfortable with that, uh, we'll leave it on the table and, uh, once we feel that we have the information we need to make a decision, we'll make the decision."

53.    The second resident persisted, asking "Do we have a timeframe at all for these folks at Ashlawn?  Or are they just going to keep coming back and . . . ."

54.    Hada responded by stating, "That's a determination for Council to make."

55.    The second resident concluded by reminding the Council that the City had already built the Battery Building, signifying that the Council obviously thought the VRFB project was a good idea at some point, and that he believed that the Council should move forward and make a decision.

56.    The Ashlawn proposal was then immediately tabled again, purportedly to be addressed at a later date.

**I.     Anthony Carson Replaces Doug Lewis as Painesville City Manager And Continues To Keep Ashlawn In Limbo**

57.    On July 1, 2013, Anthony Carson took over as Painesville City Manager, replacing Interim City Manager Doug Carson.

58.     Shortly thereafter, on July 5, 2013, an article appeared in *Mentor Patch* entitled *Painesville, Ohio: All American Energy City*.  In the article, City Councilperson Lori DiNallo commented on the status of the VRFB Project.  After noting that the loss of OAQDA funding had created an "unexpected shortfall," DiNallo stated that Painesville was currently "finalizing a revised contract to make sure that the city is in the best position."

59.     Painesville Electric Power Superintendent Jeff McHugh was also quoted in the article as stating that "The [Painesville] electric department has been working tirelessly for [the VRFB Project]."

60.     According to the article, the Painesville City Council would vote on proceeding with the VRFB Project after the Revenue Sharing Agreement was finalized, with a positive vote giving the "green light" to Ashlawn to secure its own financing.

61.     Behind the scenes however, new City Manager Anthony Carson was signaling to Ashlawn that while he still intended to go forward with the negotiation of the Revenue Sharing Agreement, he did not share Rita McMahon's same enthusiasm for the project.  In an July 23, 2013 e-mail to Norma Byron, in which Carson was responding to a request by Byron to finalize the Revenue Sharing Agreement, Carson stated, **"I know that Rita [McMahon] said that as City Manager she would sign the [Revenue Sharing] agreement[]**, but as you are aware I did not make the same acknowledgements." (emphasis added.)  Carson then told Byron to have Ashlawn's attorneys contact Painesville Law Director Joseph Gurley for further review of the agreements.

62.     Following Carson's instructions, Ashlawn attempted to engage Law Director Gurley to finalize the Revenue Sharing Agreement, but its efforts were unsuccessful.  Despite

repeated contacts by Ashlawn during the summer of 2013, Gurley would not even engage in any meaningful dialogue, let alone sign off on the pending agreements.

63.     Even though the City was clearly stalling, it was still communicating to Ashlawn that it intended to honor its commitments and finish the Project.  Thus, Ashlawn pressed forward and continued to spend time and money moving the Project toward completion.  In his February 20, 2015 Interim Report to the Painesville City Council, Painesville Electric Power Superintendent Jeff McHugh confirmed that the Project's Interoperability and Cyber Security Plan, Project Definitization plan, Project Management Plan, and National Environmental Policy Act Requirements were all completed on schedule.

**J.      The Parties Seek And Receive A Two-Year Extension From DOE To Complete The VRFB Project, As Painesville Continues To Signal That It Will Enter Into The Revenue Sharing Agreement**

64.     The 2010 Cooperative Agreement between Painesville and the DOE required the VRFB Project to be completed by January 31, 2014.

65.     With Painesville continuing to stall on the Revenue Sharing Agreement and the original completion date drawing close, the parties decided to apply to the DOE for a two-year extension to complete the VRFB Project.  On January 27, 2015, they entered into an Extension Agreement memorializing this plan.

66.     The Department of Energy eventually consented to the extension, and the Project's completion date was changed to January 31, 2016.

**K.      Ashlawn Continues To Invest In The VRFB Project While The Department Of Energy Raises Questions About Painesville's Conduct**

67.     Through the remainder of 2014 and 2015, Ashlawn continued to invest in the VRFB Project.  It also prepared and submitted the required reports to the DOE in order to meet the new January 31, 2016 deadline.  In addition, it met with investor groups, at least two of

whom expressed a willingness to finance the completion of the Project, subject to the City's acceptance of a Revenue Sharing Agreement.

68.     The City continued to express to Ashlawn and the DOE that it was still invested in completing the Project, and that it was willing to enter into a Revenue Sharing Agreement. A February 20, 2015 Technology Performance report submitted by the parties to the DOE stated: "[T]he political change of Administration in the State of Ohio and subsequent reprioritizing of state funding zeroed out the anticipated matching state funding program, so the project was re-scoped to allow for commercial funding. As a prerequisite to attracting commercial investment, it was necessary to rescope the project's goals in order to achieve the highest economic return. It was determined that the revenues stream providing the highest economic return was frequency regulation."

69.     Yet despite giving the clear impression to the DOE and to Ashlawn that it was on board with taking steps to attract commercial funding, the City would never respond to Ashlawn's draft proposals or engage in any serious negotiations. City Manager Carson would claim that the draft agreements were being reviewed by Law Director Gurley, but neither would provide any substantive responses to Ashlawn.

70.     Painesville's obvious obstruction caught the attention of the DOE. On June 23, 2014, Ronald Staubly, the DOE's VRFB Project Manager from the National Energy Technology Laboratory, sent an e-mail to Painesville Finance Director Andy Unetic, City Manager Anthony Carson, Electric Power Superintendent Jeff McHugh, and Law Director Joseph Gurley.

71.     Staubly first took issue with Painesville's position that "it was never part of the deal to come up with revenue streams" for the VRFB Project. He stated that it was obvious that some sort of "operations contract" between the City and Ashlawn "was envisioned from the

beginning of the project" and that the Revenue Sharing Agreement was "not something new or additional to the project but a component of the project from the beginning."

72. Second, Staubly questioned why Painesville was refusing to move forward with the execution of the Revenue Sharing Agreement when Ashlawn's proposal created no financial risk for the City, and if anything, presented the opportunity to create additional revenue streams.

73. Finally, Staubly raised questions about Painesville's real motives. He noted that recipients of federal financial assistance agreements are required to put forth their "best efforts" and that "some aspects of the [VRFB Project], as appearing to the casual observer, do give pause as to whether this was the City's 'best effort'". Staubly then noted that "The city's commitment to [the VRFB] project has been somewhat suspect since late 2012, when the changeover in city personnel resulted in the loss of many of the project's prior supporters."

74. The January 31, 2016 deadline for the DOE passed. Meanwhile, Ashlawn continued to try to finalize a Revenue Sharing Agreement, and Painesville continued to represent that it was interested in moving the project forward while abstaining from any activity that might actually allow for progress.

75. On September 19, 2016, Painesville Electric Power Superintendent Jeff McHugh made a presentation at a Painesville City Council Meeting, during which he suggested that Painesville was talking to battery producers other than Ashlawn about using the Battery Building at the Coal Plant. With regard to the VRFB Project, McHugh said, "That project hasn't really settled yet with the DOE, the Department of Energy, based on the other side, so what we're trying to do is to either find an easy exit out or put another project in there. So in that sense we've been in ongoing discussions with some developers who've come up with different batteries . . . so they're working on proposals . . . ."

76.     At no time prior to September 19, 2016 did anyone in the Painesville City Government inform Ashlawn that the City was looking for an "easy out" from the VRFB Project.

77.     To the contrary, during this time, Painesville was still representing to Norma Byron that it was working toward finalizing a Revenue Sharing Agreement.  During that very same September 19, 2016 City Council Meeting, McHugh responded to a question about Norma Byron by admitting that the City was still in ongoing discussions with Ashlawn.

**L.      Painesville Rejects Ashlawn's Final Attempts To Find A Cooperative Solution in 2017**

78.     As of 2017, Ashlawn had invested $3,817,479.33 in the VRFB Project to obtain DOE matching funds, which exceeded the $3,697,000 to which it had contractually committed in 2011.  In addition to the $3,817,479.33, it had incurred additional project-related expenses of $652,415.16.   On the other hand, Painesville had expended just $763,261.21 on the VRFB Project, roughly half of the $1,473,000 it had agreed to expend in the Project Management Plan incorporated into the 2010 Contract.

79.     In August 2017, with millions already invested and the City showing no inclination to move forward, Ashlawn retained legal counsel.  Ashlawn's counsel drafted a letter to Painesville Law Director Joseph Gurley that asked Painesville to work with Ashlawn to find a cooperative solution to move the VRFB Project forward.

80.     Gurley responded on September 8, 2017, stating that Ashlawn and Painesville had no contractual relationship, and that the City had satisfied all of its contractual obligations.

81.     Further, Gurley claimed that the City's decision to abandon the VRFB Project was in part due to the fact that the battery demonstrated by Ashlawn during testing was not 1MW.  This claim showed the City's basic misunderstanding of the nature of the Project.  The Project Management Plan for the Project laid out a step-by-step approach for Ashlawn to scope

out project development, and then build and test 10 kilowatt ("KW") batteries. These 10 KW batteries are the basic building blocks, or modules, of the VanCharg™ battery system. The 1 MW battery that the VRFB Project called for consisted of stacking 100 10KW VanCharg™ batteries, but production and installation on this scale was only possible if the Project became fully funded. Because of the City's senseless obstruction, it never did.

82. Gurley's letter concluded with the same oddly ambiguous language that had been communicated to Ashlawn since the departure of Rita McMahon: "[T]he City continues to seek methods to improve electric service to its customers. Vendors who have in their immediate possession, items that can facilitate the City's desire to improve electric service to its customers are encouraged to contact the City concerning their existing products. If Ashlawn is such a vendor, it should proceed accordingly."

**M.      Painesville Defames Ashlawn and Tortiously Interferes With Its Potential Customer**

83. Beginning in 2017 and continuing into 2018, Ashlawn had been working to obtain an agreement with the New York City Transit Authority ("NYCTA") to complete a lucrative battery project at one of NYCTA's terminals.

84. On May 11, 2018, Thomas Lamb, the Chief of Innovation and Technology of NYCTA, informed Ashlawn that, after having discussions with representatives from the City Government of Painesville about Ashlawn's performance in furtherance of the VRFB Project, NYCTA could not enter into an agreement with Ashlawn for the NYCTA terminal project. Citing specifically to "Ashlawn's Energy's Past Performance Issues and Technology Readiness Level demonstrated in a curtailed effort to deliver a 1MW battery system," Lamb claimed that working with Ashlawn simply presented "too much risk."

85.     Telephone conversations between Thomas Lamb and Ashlawn confirmed that representatives of Painesville had engaged in communications with Lamb, and on May 16, 2018, Lamb reconfirmed his discussion with Painesville in writing.

86.     Lamb was told by representatives of the Painesville Government that Ashlawn failed to live up to its contractual obligations in furtherance of the VRFB Project, and that it had not possessed the technological capability to deliver the promised battery.

87.     These statements are completely false and defamatory, and the Painesville representative or representatives who made them knew they were false when communicating them to NYCTA.

**N.     Painesville's City Government Rejects Ashlawn's Final Attempt To Work Cooperatively**

88.     On May 10, 2018, after learning that Painesville had interfered with the NYCTA deal, Ashlawn's counsel sent a letter and an e-mail to Painesville's city leadership, including Joseph Gurley, current Painesville City Manager Monica Irelan, and the entire City Council.

89.     The letter requested that Painesville cease and desist from making misrepresentations about Ashlawn, and to retract and correct any misstatements that had already been made.

90.     The e-mail informed the City Government that Ashlawn still wanted to find a mutually acceptable solution to move the VRFB Project forward, but that if the City was not even willing to talk, Ashlawn would be left with no choice but to pursue a lawsuit to recover its damages.  The letter concluded by asking the City Government to provide a list of available dates and times for a face-to-face meeting to explore potential solutions.

91.     Ashlawn never received a list of available meeting dates.  Instead, it received a letter, dated May 16, 2018, from Joseph Gurley, in which the City stated that it had "no

evidence" that its policy against defamation had been breached, and it referred Ashlawn back to its September 8, 2017 letter regarding the future of the VRFB Project. The City was not even willing to meet with Ashlawn.

## COUNT ONE
### (Breach of Contract)

92. Ashlawn incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

93. On May 4, 2010, Ashlawn and Painesville entered into the 2010 Contract.

94. The 2010 Contract was amended to incorporate the Project Management Plan. In 2011, the 2010 Contract was amended to state that "The CITY and ASHLAWN cost share shall be as outlined in the approved Project Management Plan Section F . . . ."

95. The approved Project Management Plan called for Ashlawn to expend $3,697,000 in cost share in furtherance of the VRFB Project.

96. Ashlawn exceeded this requirement, and performed its obligations under the 2010 Contract.

97. The Project Management Plan called for Painesville to expend $1,473,000 in cost share in furtherance of the VRFB Project.

98. Painesville failed to expend the $1,473,000 required by the contract. Instead, it breached the 2010 Contract by spending only $763,261.21 on the Project.

99. The 2010 Contract also assumed that Painesville would work with Ashlawn to take the steps necessary to operate and monetize the VRFB Project.

100. As the DOE itself pointed out in June 2014, the Revenue Sharing Agreement was "not something new or additional to the project but a component of the project from the beginning . . . ."

101.     Instead of working with Ashlawn in a reasonable and honest way, and remaining faithful to the parties' common purpose and their original expectations, the City refused to finalize the Revenue Sharing Agreement, or even negotiate its terms.

102.     The City was well aware that in doing this, it was impeding Ashlawn's ability to get the necessary funding for the Project, and thus, was effectively terminating it.

103.     The actions taken by Painesville to prevent Ashlawn from completing the Project constitute a breach of the implied covenant of good faith and fair dealing.

104.     As a result of Painesville's failure to perform its contractual obligations, the Project was never completed, and Ashlawn suffered financial harm in an amount to be determined at trial.

## COUNT TWO
### (Promissory Estoppel)

105.     Ashlawn incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

106.     From the time the 2010 Contract was signed, Painesville promised Ashlawn that it would work cooperatively with Ashlawn to complete the VRFB Project.

107.     Even after the loss of OAQDA funding in 2012, Painesville's City Government, led by Rita McMahon, made a specific promise to Ashlawn that it would sign a Revenue Sharing Agreement, thus paving the way for Ashlawn to eliminate the shortfall with funding from private investors.

108.     McMahon and the Painesville City Government knew that Ashlawn would rely on this promise, and its reliance was entirely reasonable and foreseeable.

109.     Ashlawn did in fact rely on this promise, as it continued to expend time and money on the VRFB Project.

110. McMahon's successor as City manager, Anthony Carson was well aware of the prior administration's promise, as he confirmed in his July 23, 2013 e-mail to Normal Byron.

111. Despite stating that he would not blindly honor the prior administration's commitments, Carson promised Ashlawn that the City would work with it to finalize the Revenue Sharing Agreement.

112. Carson intended to induce Ashlawn's reliance on this promise so that it would continue to work on the VRFB Project, and Painesville could continue to give the outward appearance that it was complying with the DOE Cooperative Agreement.

113. Ashlawn did in fact rely on Carson's promise, and continued to expend resources to its detriment.

114. As a result of Ashlawn's reliance on the foregoing promises, it suffered damages in an amount in excess of $4,000,000.00.

### COUNT THREE
### (Defamation)

115. Ashlawn incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

116. In 2018, Painesville communicated to NYCTA that Ashlawn had failed to live up to its contractual obligations in furtherance of the VRFB Project, and that it did not possess the technological capability to deliver the battery called for to complete the Project.

117. Painesville made this statement to NYCTA without privilege.

118. Painesville knew when it made this statement to NYCTA that it was untrue, and that it was likely to harm Ashlawn's ability to win NYCTA's business.

119.    As a result of Painesville's false and defamatory communication, Ashlawn did not win NYCTA's business, and suffered a resulting financial harm in an amount to be determined at trial.

## COUNT FOUR
### (Intentional Interference With Prospective Economic Advantage)

120.    Ashlawn incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

121.    Ashlawn engaged in lengthy negotiations with NYCTA to win its business for the terminal project, and had an expectancy that the relationship would result in the formation of a contract.

122.    When NYCTA reached out to Painesville, the City became aware of the fact that Ashlawn was on the cusp of a contractual relationship with NYCTA.

123.    When Painesville communicated to NYCTA that Ashlawn had failed to live up to its contractual obligations in furtherance of the VRFB Project, and that it did not possess the technological capability to deliver the battery called for to complete the Project, it intentionally and improperly interference with Ashlawn's relationship with NYCTA, and caused NYCTA to terminate the relationship.

124.    Painesville's interference was the result of an improper motive.  The City did not want Ashlawn to demonstrate the viability and benefits of VanCharg™ elsewhere, thus proving that the City, not Ashlawn or its product, was the reason for the failure of the VRFB Project.

125.    As a result of Painesville's tortious interference, Ashlawn suffered financial harm in an amount to be determined at trial.

WHEREFORE, Plaintiff Ashlawn Energy, LLC demands judgment in its favor and against Defendant City of Painesville as follows:

a.  On Count One, for the sum of $10,000,000, plus interest;

b.  On Count Two, for the sum of $4,469,894.49, plus interest;

c.  On Count Three, for the sum of $1,992,667, plus interest;

d.  On Count Four, for the sum of $1,992,667, plus interest;

e.  For its court costs; and

f.  For such other and further relief as this Court finds just and equitable.

## JURY DEMAND

Plaintiff demands a jury on all issues presented in this complaint.

Respectfully submitted,

Seth J. Linnick (0083494)
John Q. Lewis (0067235)
TUCKER ELLIS LLP
950 Main Avenue
Suite 1100
Cleveland, OH 44113
Telephone:  216.696.5000
Facsimile:  216.592.5000
Seth.Linnick@tuckerellis.com
John.Lewis@tuckerellis.com

Attorneys for Plaintiff
Ashlawn Energy LLC